IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| CARL E. WOODWARD, LLC and § | | |
| GRAY INSURANCE COMPANY § | | PLAINTIFFS |
| § | | |
| v. § | | Civil Action No. 1:09cv781-LG-RHW |
| § | | |
| ACCEPTANCE INDEMNITY § | | |
| COMPANY, et al § | | DEFENDANTS |

### MEMORANDUM OPINION AND ORDER CONCERNING
### THE PARTIES' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

**BEFORE THE COURT** are the Motion for Partial Summary Judgment [167] filed by Carl E. Woodward, LLC, the Motion for Partial Summary Judgment on All Non-Bad Faith Claims [169] filed by Acceptance Indemnity Company, and the Motion for Partial Summary Judgment on Bad Faith and Extra-Contractual Claims [173] filed by Acceptance Indemnity Company. Woodward seeks a determination that Acceptance had a duty to defend Woodward against claims asserted by Pass Marianne, LLC. Meanwhile, Acceptance seeks a determination that it did not have a duty to defend or indemnify Woodward in the Pass Marianne litigation, or in the alternative, that it at all times acted in good faith and with an arguable or legitimate basis while handling Woodward's demand for a defense and indemnity.  Upon reviewing the submissions of the parties and the applicable law, the Court finds that Acceptance had a duty to defend Woodward, and that it did not have an arguable basis for failing to defend Woodward.  Furthermore, genuine issues of material fact exist regarding whether Acceptance has a duty to indemnify the plaintiffs.  However, Acceptance is entitled to summary judgment regarding the plaintiffs' bad faith claim.

## FACTS

In 2005, Woodward and Pass Marianne, LLC, entered into a contract in which Woodward agreed to construct the Pass Marianne Condominiums in Pass Christian, Mississippi. Thereafter, Woodward entered into subcontracts with several entities, including a concrete contractor that referred to itself as "DCM, Inc." In accordance with the terms of these contracts, each subcontractor made Woodward an additional insured on its commercial general liability policy. DCM, Inc., made Woodward and Pass Marianne additional insureds on a policy issued to a handyman company named DCM Construction, LLC, by Acceptance.

In 2008, Woodward and Pass Marianne were sued by Lemon Drop Properties[1] as a result of problems with the condominium project. Pass Marianne then filed a cross-claim against Woodward, asserting the following allegations: (1) Woodward attempted to alter its contract with Pass Marianne after the offices of both companies were destroyed by Hurricane Katrina; (2) Woodward issued a change order in excess of $1 million for work allegedly related to the hurricane; (3) Woodward built the foundation piers in non-conformity with plans and specifications and altered the blueprints in an attempt to cover up this problem; (4) Woodward attempted to remove the clause in the parties' contract that permitted Pass Marianne to recover punitive and consequential damages by providing a doctored copy to Pass Marianne; (5) Woodward took advantage of the destruction of the model condominium unit and

---

[1] The Court has not been informed of the relationship between Lemon Drop and the Pass Marianne project.

"cheapened" the interior finishes of the condominium units; (6) Woodward instructed the roofing contractor to install the roof in a "cheap and shoddy manner;" (7) Woodward contracted for inferior exterior doors and misrepresented that the cheap doors were installed at the insistence of the developers; and (8) Woodward "systematically defamed" Pass Marianne by informing the condominium unit owners that the developers instructed Woodward to cheapen the project. (Ex. 8 to Woodward's Mot.). Woodward demanded an arbitration of Pass Marianne's claims against it.

Woodward claims that its attorney sent letters to each subcontractor's insurer, demanding that each insurer provide a defense and indemnity regarding the claims asserted by Pass Marianne. Woodward also alleges that each insurer was provided with a copy of a report prepared by Pass Marianne's consultants, Rimkus Consulting Group, which itemized the claims for damages.

The Rimkus Report did not specifically mention DCM, but it contained allegations concerning the concrete utilized in the project. The Report alleged that the concrete subcontractor did not comply with the Design/Build Agreement and/or industry standards, because the atrium floor was not properly sloped, which prevented water from entering the drains properly. (Ex. 10 to Woodward's Mot. at 5). The Report also claims that the concrete subcontractor failed to comply with construction drawings and industry standards by not installing a step in the slab at the balcony exterior walls and doors. (*Id.* at 8). This problem allegedly caused damage to the exterior walls of the condominium units. (*Id.*) The Report also claims that the balcony floors were not properly sloped so as to allow proper drainage. (*Id.*) Furthermore, the Report

described problems with the finish of the concrete in the parking garage, unsightly trenches that were cut into the concrete to assist with drainage, and drainage problems in the atrium caused by an inadequate slope. (*Id.* at 35-37).

Acceptance rejected Woodward's demand for a defense and indemnity, arguing that, based on the timing of the Rimkus report, the damages occurred after DCM completed its work on the project. (Ex. 13 to Woodward's Mot.) It also noted that the construction ended after the policy expired. (*Id.*) The Arbitration Panel ordered Woodward to pay Pass Marianne $1,640,569.06 in damages. (Ex. 12 to Woodward's Mot.) Over $140,000 in damages appear to pertain to the problems with the concrete. (*Id.*) DCM did not participate in the arbitration. Woodward was defended by its own insurer, Gray Insurance Company, and thus, Gray is also seeking indemnification from Acceptance in this lawsuit.

## DISCUSSION

### I. Standard of Review

Any party to a civil action may move for summary judgment upon a claim, counterclaim, or cross-claim as to which there is no genuine issue of material fact and upon which the moving party is entitled to prevail as a matter of law. Fed. R. Civ. P. 56. A party seeking summary judgment bears the initial burden of identifying those portions of the pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant carries its burden, the burden shifts to the non-movant to show that summary judgment should not be granted.

*Celotex Corp.*, 477 U.S. at 324-25.  The non-moving party may not rest upon mere allegations or denials in its pleadings but must set forth specific facts showing the existence of a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

## II.  **The Duty to Defend and the Duty to Indemnify**

"Generally, '[t]he obligation of the insurer to defend is to be determined by analyzing the allegations of the complaint or declaration in the underlying action.'" *Architex Ass'n v. Scottsdale Ins. Co.*, 27 So. 3d 1148, 1156 n.14 (Miss. 2010) (quoting *United States Fid. & Guar. Co. v. Omnibank*, 812 So. 2d 196, 200 (Miss. 2002)). However, even where the allegations in the complaint do not fall within coverage, an insurer has a duty to defend a claim if the insurer has knowledge of facts that would trigger coverage.  *See Architex*, 27 So. 3d at 1156 n. 14 (citing *Mavar Shrimp & Oyster Co. v. U.S. Fid. & Guar. Co.*, 187 So. 2d 871, 875 (Miss. 1966); *Merchs. Co. v. Am. Motorists Ins. Co.*, 794 F. Supp. 611, 617 (S.D. Miss. 1992).  "[T]he duty to defend is broader than the insurer's duty to indemnify under its policy of insurance: the insurer has a duty to defend when there is any basis for potential liability under the policy." *Titan Indem. Co. v. Pope*, 876 So. 2d 1096, 1100 (Miss. Ct. App. 2004) (quoting *Merchs. Co.*, 794 F. Supp. at 617).

### A.  **Acceptance's Named Insured**

Acceptance first argues that the named insured under the policy was DCM Construction, LLC, and this entity did not perform any work on the Pass Marianne

project. The named insured listed on the declarations pages of the policies at issue is "DCM Corporation, LLC," but Acceptance asserts that the named insured should have been listed as "DCM Construction, LLC." (Ex. 3 to Woodward's Mot. at 2; Ex. 4 to Woodward's Mot. at 11). DCM, LLC, is described as a handyman business on the declarations page. (*Id.*) The commercial insurance application seeking insurance for DCM, LLC, was signed by Russell King. (Ex. G to Acceptance's Mot. [169]). The concrete subcontractor that entered into a contract with Woodward was named "DCM, Inc.," and it was signed by Alphonse White. (Ex. 2 to Woodward's Mot.)

The policies at issue in the present case provide that Woodward is named as an additional insured "but only with respect to liability arising out of your ongoing operations performed for that insured." (Ex. 3 to Woodward's Mot. at 34; Ex. 4 to Woodward's Mot. at 4, 9). Throughout the policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. (Ex. 3 at 21, Ex. 4 at 20). The policy provides that when the named insured is designated as a limited liability company, the company's members are also insureds but only with respect to the conduct of the company's business. (Ex. 3 at 26; Ex. 4 at 25). The company's employees are also included as insureds but only for acts within the scope of their employment or while performing duties related to the conduct of the insured's business. (*Id.*)

Russell King, the person who obtained the insurance policies on behalf of DCM, LLC, testified by deposition that "DCM, Inc." is not his company. (Ex. H to Acceptance's Mot. [169] at 7). He also testified that he had never seen the subcontract at issue before, and his company did not do work at the Pass Marianne project. (*Id.* at

6,8). He testified that Alphonse White had never been employed by his company, but he had attempted to form a joint venture with White in order to bid on an Alfonso Realty Company project in Ocean Springs, Mississippi. (*Id.* at 9, 12-13). They did not get the job. (*Id.* at 13). He thinks he sent an insurance certificate to White for the purpose of bidding on that project. (*Id.*) He testified that White was acting as DCM, LLC's agent. (*Id.* at 23). White never obtained any work on behalf of DCM, LLC. (*Id.* at 28). White invoked his rights under the Fifth Amendment when he was deposed regarding his actions in this matter. (Ex. I to Acceptance's Mot. [169]).

Woodward argues that Acceptance has admitted that the concrete subcontractor was its insured. In its Answer, Acceptance stated, "Acceptance admits, upon information and belief, the existence of contracts between Pass Marianne, LLC, and Woodward, and subcontracts between Woodward and DCM Construction, LLC, the terms, conditions and defenses of which are best evidenced by the written instruments themselves." (Ex. 11 to Woodward's Resp. [190] at 3, ¶11). Acceptance's corporate representative testified by deposition that Acceptance issued a policy to a party that did work at Pass Marianne, and that she believed that the company is named DCM Corp. (Ex. 8 to Woodward's Resp. [190] at 8). She also stated that it was her understanding that Acceptance's insured was the concrete subcontractor on the Pass Marianne project. (*Id.* at 24).

The Fifth Circuit has explained:

A judicial admission is formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them. Although a judicial admission is not itself evidence, it has the effect of

> withdrawing a fact from contention. . . . [A]n ordinary evidentiary admission is "merely a statement of assertion or concession made for some independent purpose," and it may be controverted or explained by the party who made it.  "A judicial admission is conclusive, unless the court allows it to be withdrawn; ordinary evidentiary admissions, in contrast, may be controverted or explained by the party."

*Martinez v. Bally's La., Inc.*, 244 F.3d 474, 476-77 (5th Cir. 2001) (quoting *McNamara v. Miller*, 269 F.2d 511, 515 (D.C. Cir. 1959); *Keller v. United States*, 58 F.3d 1194, 1199 n.8 (7th Cir. 1995)).  "When a party testifying at trial or during a deposition admits a fact which is adverse to his claim or defense, it is generally preferable to treat that testimony as solely an evidentiary admission."  *Keller*, 58 F.3d at 1199 n. 8 (quoting Michael H. Graham, Federal Practice and Procedure § 6726, at 536-37).

The Court finds that the statement included in Acceptance's Answer does not constitute a binding judicial admission, because it was based on information and belief. The statements made by Acceptance's corporate representative also do not constitute binding judicial admissions, because they were not contained in pleadings, a stipulation, or a response to a request for admissions.  However, these statements are evidentiary admissions that create a genuine issue of material fact regarding whether the concrete subcontractor was Acceptance's insured.

Assuming that no exclusions or policy provisions otherwise preclude coverage under the policies, the Court finds that there is a basis for potential liability under the policy, because there is evidence before the Court that tends to show that the concrete subcontractor was Acceptance's insured.  As a result, the Court must address each of the provisions and exclusions that Acceptance claims precludes coverage.

**B. The Existence of an Occurrence and the Expected and Intended Acts Exclusion**

The policies provide, "This insurance applies to 'bodily injury' and 'property damage' only if: (1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and (2) The 'bodily injury' or 'property damage' occurs during the policy period."  (Ex. 3 to Woodward's Mot. at 21; Ex. 4 to Woodward's Mot. at 20).  The term "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Ex. 3 at 31, Ex. 4 at 30).  Moreover, the policies state:

> This insurance does not apply to:
> a.  Expected or Intended Injury
> "Bodily injury or "property damage" expected or intended from the standpoint of the insured.

(Ex. 3 at 21, Ex. 4 at 20).

In *Southern Farm Bureau Cas. Ins. Co. v. Allard*, the Mississippi Supreme Court upheld a jury verdict that an insured's shooting was an accident because, although the insured intended to shoot in the direction of his brother-in-law, he did not intend to actually hit him.  *S. Farm Bureau Cas. Ins. Co. v. Allard*, 611 So. 2d 966, 968-69 (Miss. 1992). In *Allstate Insurance Co. v. Moulton*, the Mississippi Supreme Court held that a court should look to whether the act committed by the insured was intentional rather than whether the consequences of that act or any unintended damages flowing from that act were intended, while interpreting the term "accident" in a commercial general liability policy.  *Allstate Ins. Co. v. Moulton*, 464 So. 2d 507, 509-10 (Miss. 1985).  In *Moulton*, an insured sought a declaration that her insurer had a duty to defend her in

a malicious prosecution action. *Moulton*, 464 So. 2d at 508. The Court in *Moulton* held that the insured was not entitled to a defense since she intended to have the claimant arrested, even though she did not intend for the claimant to suffer humiliation or embarrassment as a result of that arrest. *Id.* at 510. In *OmniBank*, the Mississippi Supreme Court reconciled the *Allard* and *Moulton* decisions and held that "a claim resulting from intentional conduct which causes foreseeable harm is not covered, even where the actual injury or damages are greater than expected or intended." *OmniBank*, 812 So. 2d at 201 (¶20). The Court noted that *Allard* and *Moulton* "are consistent in that they both address the nature of the insured party's conduct, not the resulting damages of that conduct." *Id.* at 201 (¶19).

The Fifth Circuit, in *ACS Constr. Co., Inc. v. CGU*, 332 F.3d 885 (5th Cir. 2003), held that the insured was not entitled to coverage under a commercial general liability policy for damage caused by leaking waterproofing membranes installed by its subcontractor, because the hiring of subcontractors and the installation of the waterproofing membrane did not constitute "accidents" under the terms of the policy. *ACS Constr. Co., Inc.*, 332 F.3d at 891. The Court explained that, "even though the installation of the membrane was done negligently, the action of installing the membrane was not accidental nor unintended to implicate coverage under the policy." *Id.* at 890.

In *Architex Association, Inc. v. Scottsdale Insurance Company*, 27 So. 2d 1148 (Miss. 2010), the Mississippi Supreme Court addressed the definition of "occurrence"

in the construction context for the first time. Architex was sued by a hotel project owner for a subcontractor's alleged failure to include rebar in the foundation, and it sued Scottsdale for failing to provide a defense and indemnity. *Id.* at 1150 (¶4). The question before the Supreme Court in *Architex* was limited to "whether [Architex's] intentional hiring or utilization of subcontractors to perform work on one of its projects negates coverage included in the . . . policies issued by Scottsdale Insurance Company to Architex." *Architex*, 27 So. 2d at 1149 (¶1). The Court explained:

> Unlike in this case, the insured in both *Moulton* and *Omnibank* were the parties who engaged in intentional and allegedly tortious conduct leading to the injuries complained of. Thus, the insured's intentional actions did not constitute "accidents," and the damages resulting therefrom did not amount to "occurrences" under the respective policies. In the present case, by contrast, the only act or conduct considered by the circuit court was the hiring of the subcontractors, without consideration of whether the underlying acts or conduct of the insured or the subcontractors proximately causing "property damage" were negligent or intentional or were otherwise excluded by policy language. While the alleged "property damage" may have been "set in motion" by Architex's intentional hiring of the subcontractors, the "chain of events" may not have "followed a course consciously devised and controlled by [Architex], without the unexpected intervention of any third person or extrinsic force."

*Id.* at 1159 (¶25). The Court noted that Scottsdale charged Architex an additional premium for projects on which it utilized subcontractors, and the policy contained an exception to the "damage to your work" exclusion that pertained to work performed by subcontractors. *Id.* at 1160 (¶27), 1161-62 (¶¶30-31). The Court also attempted to clarify what it perceives as confusion among insurers, insureds, and courts, by stating:

> Faulty workmanship, defective work, et al., may be accidental, intentional, or neither. A return to basics leads this Court to conclude that the underlying facts will determine whether the complaint of

-11-

> "property damage" (defective or faulty workmanship) was proximately caused by breach of a recognizable duty and whether that breach was accidental or intentional; or whether the "property damage" was caused by neither. In two of the three aforementioned scenarios, no coverage would exist. Only when property damage is proximately caused by an accident (an inadvertent act) does an "occurrence," as defined by the policy, trigger coverage.

*Id.* at 1161 (¶28). Thus, if the faulty workmanship was accidental, it would constitute an "occurrence" under a commercial general liability policy, as long as no other policy provisions preclude coverage. *See id.* In *Architex*, the Court held that the record was insufficiently developed for it to determine whether the faulty workmanship was accidental. *Id.*

Therefore, pursuant to the *Architex* decision, faulty workmanship and the hiring of a subcontractor are not as a matter of law excluded from coverage, and this Court must look to the facts and evidence presented in this case to determine whether coverage exists. The alleged faulty workmanship at issue in the present case primarily concerns the failure to properly slope the balcony, atrium, and parking garage floors to allow proper drainage, and the failure to install a continuous step at the balcony exterior walls and doors. The Rimkus Report states that the project drawings did not require a positive slope away from the walls and doors of the condominium units, and thus, Acceptance argues that the failure to include the slope was intentional. (Ex. 10 at 49-50). However, the Report also states that the concrete subcontractor failed to comply with the drawings by omitting the continuous step at the balcony doors and walls. (*Id.* at 49). The failure to include the step caused damage to the exterior walls,

according to the Report. (*Id.*) The Court cannot determine from the record before it whether the concrete subcontractor accidentally omitted the step. Nevertheless, the information provided to Acceptance in the Rimkus Report was sufficient to trigger potential liability under the policy and thus a duty to defend, assuming that none of the other policy provisions preclude coverage.

### C. Work in Progress Exclusions-- Exclusions j.(5) and j.(6)

The Acceptance policies also provide that the insurance does not apply to "property damage" to:

> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
>   . . . .
> Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

(Ex. 3 to Woodward's Mot. at 23; Ex. 4 at 22). These exclusions are often referred to as "business risk exclusions," "ongoing work exclusions," or "work product exclusions," and they are usually labeled exclusions j.(5) and j.(6) in standard commercial general liability policies. The "products-completed operations hazard" mentioned in the exclusion:

> a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
>   . . .
>   (2) Work that has not yet been completed or abandoned. . . .

(Ex. 3 at 31; Ex. 4 at 30). Furthermore, "your work" is defined as "[w]ork or operations

-13-

performed by you or on your behalf; and materials, parts or equipment furnished in connection with such work or operations." (Ex. 3 at 32; Ex. 4 at 33). Throughout the policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. (Ex. 3 at 21, Ex. 4 at 20).

Therefore, these exclusions apply to damages that occur while the insured's work is in progress. For the purposes of the pending motions, the parties do not appear to dispute that the damages occurred while the concrete subcontractor's work was in progress. However, Woodward argues that these exclusions only apply to damages to the insured's work, while Acceptance argues that the underlying complaint against Woodward seeks money to repair the concrete subcontractor's allegedly defective work. The contract between Woodward and the subcontractor at issue pertained solely to concrete work. Thus, the "particular part of real property" on which the concrete subcontractor was working was the concrete. Contrary to Acceptance's arguments, the Rimkus Report clearly describes damages to other property, including exterior walls and doors. The Report also references water intrusion affecting the condominium units. Therefore, the exclusions do not apply to the damage to the exterior walls, the exterior doors, or the interior of the units. The exclusions would only apply to the replacement or repair of the concrete work. As a result, exclusions j.(5) and j.(6) do not preclude coverage.

### D. The Damage to Your Work Exclusion

The policies provide that the insurance does not apply to "'property damage' to 'your work' arising out of it or any part of it and included in the 'products-completed

-14-

operations hazard.'" (Ex. 3 at 23-24; Ex. 4 at 24-25). As explained previously, the Rimkus Report clearly indicates that the damage was not limited to the concrete subcontractor's work. As a result, the Damage to Your Work Exclusion does not preclude coverage.

### E. Damage and Losses Occurring after Project Completion

The Acceptance policies provide that Woodward is named as an additional insured "but only with respect to liability arising out of your ongoing operations performed for that insured." (Ex. 3 to Woodward's Mot. at 34; Ex. 4 to Woodward's Mot. at 4, 9). The policies also provide that the insurance coverage provided to Woodward does not apply to property damage occurring after "all work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance and repairs) to be performed by or on behalf of the additional insured(s) at the site of the covered operations has been completed . . . ." (*Id.*)

Acceptance has not identified any property damage that occurred after the project was completed, and the Court has not located any evidence of such damage. As a result, the Court finds that this exclusion did not obviate Acceptance's duty to defend Woodward.

### F. Alleged Deficiencies in Expert Testimony

Finally, Acceptance argues that it should not be held liable for Woodward's defense or indemnification, because the plaintiffs have not designated an expert to testify regarding the property damage, and the expert attorney designated to opine

regarding attorney's fees has not distinguished between the cost of prosecuting a claim on behalf of Woodward versus the cost of defending Woodward in the arbitration. The Court finds that these alleged deficiencies are insufficient to warrant granting summary judgment in favor of Acceptance. Although the plaintiffs may have difficulty demonstrating the amount of property damages and attorney's fees with sufficient certainty, there is sufficient evidence before the Court to create a material question of fact and thus justify denying summary judgment.

### III. Bad Faith and Extra-contractual Damages Claims

Acceptance also seeks partial summary judgment regarding the plaintiffs' bad faith and extra-contractual damages claims. The issue of whether an insured should recover punitive damages for an insurer's bad faith should not be submitted to a jury unless the trial court determines that there are jury issues with regard to whether: (1) the insurer lacked an arguable or legitimate basis for denying the claim, and (2) the insurer committed a wilful or malicious wrong, or acted with gross and reckless disregard for the insured's rights. *United Am. Ins. Co. v. Merrill*, 978 So. 2d 613, 634 (¶104) (Miss. 2007). An "arguable reason" is defined as "nothing more than an expression indicating the act or acts of the alleged tortfeasor do not rise to [the] heightened level of an independent tort." *Caldwell v. Alfa Ins. Co.*, 686 So. 2d 1092, 1096 (Miss. 1996) (quoting *Universal Life Ins. Co. v. Veasley*, 610 So. 2d 290, 293 (Miss. 1992)).

Meanwhile, "when an insurance company breaches its contract with an insured but does not do so in a way that is so egregious as to permit the recovery of punitive

damages . . ., the insured in some circumstances will have a right to attorneys' fees and other expenses that were reasonably foreseeable." *Essinger v. Liberty Mut. Fire Ins. Co.*, 529 F.3d 264, 270 (5th Cir. 2008) (citing *Universal Life Ins. Co. v. Veasley*, 610 So. 2d 290, 295 (Miss. 1992)). Extra-contractual damages should only be awarded in cases involving the denial of an insurance claim without an arguable reason. *Veasley*, 610 So. 2d at 295.

Woodward argues that Acceptance acted in bad faith by failing to investigate its claims. It also points out that the only reason Acceptance stated for denying its claim was Acceptance's faulty determination that the damages occurred after the concrete subcontractor completed its work on the project. Nevertheless, there is no indication that Woodward ever attempted to correct this misunderstanding.

Acceptance relies heavily on the clarification of Mississippi law provided by the *Architex* decision. However, Acceptance did not deny a defense and indemnity based on the lack of an occurrence. The Fifth Circuit has held that, under Mississippi law, an insurer can only rely on the reasons stated for denying coverage when opposing a bad faith claim. *Sobley v. S. Natural Gas Co.*, 210 F.3d 561, 564 (5th Cir. 2000).

The Court has been unable to find any statement in either the counterclaim or the Rimkus Report that would support Acceptance's determination that the work was not ongoing at the time that the damage occurred. Therefore, the Court finds that Acceptance did not have an arguable basis for denying a defense to Woodward. However, there is no evidence that Acceptance committed a wilful or malicious wrong or acted with gross or reckless disregard for Woodward's rights, particularly since it

was provided with very little information with which to make its coverage determination. As a result, Acceptance is entitled to summary judgment with regard to the bad faith claim, but it is not entitled to summary judgment with regard to the claim for extra-contractual damages due to the lack of an arguable basis.

### CONCLUSION

The Court finds that Acceptance had a duty to defend Woodward. Therefore, Woodward's Motion for Partial Summary Judgment [167] is granted. Genuine issues of material fact exist regarding whether Acceptance has a duty to indemnify Woodward. Thus, Acceptance's Motion for Partial Summary Judgment on All Non-Bad Faith Claims [169] is denied. Finally, the Court finds that Acceptance is entitled to summary judgment as to the plaintiffs' bad faith claim, but it is not entitled to summary judgment with regard to the extra-contractual damages claim. Therefore, Acceptance's Motion for Partial Summary Judgment on Bad Faith and Extra-Contractual Claims [173] filed by Acceptance Indemnity Company is granted in part and denied in part.

**IT IS THEREFORE ORDERED AND ADJUDGED** that Woodward's Motion for Partial Summary Judgment [167] is **GRANTED**.

**IT IS FURTHER ORDERED AND ADJUDGED** that Acceptance's Motion for Partial Summary Judgment on All Non-Bad Faith Claims [169] is **DENIED**.

**IT IS FURTHER ORDERED AND ADJUDGED** that Acceptance's Motion for Partial Summary Judgment on Bad Faith and Extra-Contractual Claims [173] filed by Acceptance Indemnity Company is **GRANTED** as to the bad faith claim and **DENIED**

in all other respects.

**SO ORDERED AND ADJUDGED** this the 12th day of January, 2011.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE
